IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

JAMES SPENCER WHITEHEAD, JR.,

                Plaintiff

VS.

TYDUS MEADOWS, WARDEN, *et al.*,[1]

                Defendants

**NO. 5: 03-CV-216 (CAR)**

**PROCEEDINGS UNDER 42 U.S.C. § 1983
BEFORE THE U.S. MAGISTRATE JUDGE**

## RECOMMENDATION

Before the court is the MOTION FOR SUMMARY JUDGMENT of the defendants in the above-styled §1983 action in which JAMES SPENCER WHITEHEAD, JR. alleges that defendant CLAYTON TATUM violated his due process rights, and the other defendants acted with deliberate indifference to his serious medical needs. Tab #45. After being advised of his right to do so (Tab #49), the plaintiff responded to the defendants' motion. Tab #69. The defendants have replied to the plaintiff's Response. Tab #70. Also in the record are the testimony of doctors (both treating physicians and expert testimony relating to the treatment afforded by the defendant physicians), numerous affidavits and depositions, and a Statement of Undisputed Material Facts.

### Summary Judgment Standard

Rule 56 of the *Federal Rules of Civil Procedure* dealing with motions for summary judgment provides as follows:

> The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

---

[1] The plaintiff's amended complaint makes no allegations against OFFICER SCRIBBLING and it appearing that plaintiff is not pursuing his claim against her, IT IS RECOMMENDED that she be dismissed from the action with the right of plaintiff to file an objection to this Recommendation as directed herein.

Summary judgment can only be granted if there are no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(c); **Warrior Tombigbee Transportation Co. v. M/V Nan Fung,** 695 F.2d 1294, 1296 (11th Cir. 1983). While the evidence and all factual inferences therefrom must be viewed by the court in the light most favorable to the party opposing the motion, the party opposing the granting of the motion for summary judgment cannot rest on his pleadings to present an issue of fact but must make a response to the motion by filing affidavits, depositions, or otherwise in order to persuade the court that there are material facts present in the case which must be presented to a jury for resolution. *See **Van T. Junkins & Assoc. v. U.S. Industries, Inc.**, 736 F.2d 656, 658 (11th Cir. 1984).

Specifically, the party seeking summary judgment bears the initial burden to demonstrate to the court the basis for its motion by identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show that there is an absence of any genuine issue of material fact. **Hairston v. The Gainesville Sun Publishing Co.**, 9 F.3d 913 (11th Cir.1998). In determining whether the moving party has met this burden, the court must review the evidence and all factual inferences drawn from this, in the light most favorable to the non-moving party. **Welch v. Celotex Corp.**, 951 F.2d 1235, 1237 (11th Cir. 1992).

If the moving party successfully meets this burden, the burden then shifts to the non-moving party to establish by going beyond the pleadings, that there are genuine issues of material fact to be resolved by a fact-finder. **Clark v. Coats & Clark, Inc.**, 929 F.2d 604, 608 (11th Cir. 1991). Genuine issues are those as to which the evidence is such that a reasonable jury could find for the non-movant. **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

- 2 -

**Qualified Immunity**

All defendants in this case have asserted the defense of qualified immunity.  A public official performing a discretionary function enjoys qualified immunity in a civil action  for damages, provided his or her conduct does not violate clearly established federal rights of which a reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

> Qualified immunity protects government actors performing discretionary functions from being sued in their individual capacities. The doctrine shields government officials from liability to the extent that their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. The doctrine protects government officials from always erring on the side of caution by shielding them both from liability and the other burdens of litigation, including discovery.  *Chesser v. Sparks*, 248 F.3d 1117, 1122-23 (11th Cir. 2001) (Internal citations and punctuation omitted).

"Evaluating the defense of qualified immunity involves a two step inquiry: first, whether the defendant's conduct violated a clearly established constitutional right; and, second, whether a reasonable government official would have been aware of that fact."  *Id.* at 1123.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier v. Katz*, 533 U.S. 194, 202; 121 S.Ct. 2151, 2156 (2001).

"[D]eliberate indifference to serious medical needs is a violation of clearly established law." *Kimbell ex rel Liddell v. Clayton County, Ga.*, 170 Fed.Appx. 663 (11th Cir. 2006)(*per curiam*).

**DISCUSSION**

**CLAIM ONE – DUE PROCESS**

The plaintiff's first claim is against defendant TATUM and alleges that  plaintiff WHITEHEAD was denied due process of law with respect to his loss of a liberty interest when TATUM did not allow him to call a witness on his behalf at a disciplinary hearing.  Plaintiff avers that this resulted in his having to serve time in isolation and having his Tentative Parole Month's (TPM) pushed back six months.  A prisoner's TPM is the month "during which an inmate may expect to be released" from prison.  *Saltenfuss v. Snow*, 25 F. 3d 1494, 1497 (11th Cir. 1994).

- 3 -

The Supreme Court has found that "[s]tates may under certain circumstances create liberty interests which are protected by the Due Process Clause". ***Sandin v. Connor***, 515 U.S. 472, 783-84 (1995). Over a decade ago, the Eleventh Circuit held that Georgia's parole system does *not* create a protected liberty interest in parole: "Neither the relevant statutes nor the Guidelines contain any language mandating the outcome that must be reached after application of the specified procedures." ***Sultenfuss***, 35 F.3d at 1501-02. In an unpublished slip opinion, the Eleventh Circuit recently interpreted that language in ***Sultenfuss*** as "explaining that Georgia's parole system does not create a protected liberty interest in parole." ***Bankhead v. Georgia State Board of Pardons and Paroles***, 2006 WL 2033910, slip op. at 2 (11th Cir. 2006). Since there is no liberty interest in Georgia's parole system, there can be no due process violation.[2]

Accordingly, IT IS RECOMMENDED that the defendants' MOTION FOR SUMMARY JUDGMENT be GRANTED with respect to the plaintiff's claim of due process violations. Pursuant to 28 U.S.C. §636(b)(1), the parties may file written objections to this RECOMMENDATION with the Clerk of court directed to the district judge assigned to this case, **WITHIN TEN (10) DAYS** after being served with a copy thereof.

### CLAIM TWO – DELIBERATE INDIFFERENCE

The plaintiff's second claim – against Warden TYDUS MEADOWS, Dr. ODERINDE, and Dr. KALU KALU – alleges that these defendants were deliberately indifferent to the plaintiff's serious medical needs.

In ***Estelle v. Gamble***, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251, *rehearing denied* 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1976). Over the last thirty years, the Eleventh Circuit has refined ***Estelle***:

---

[2]The undersigned recognizes that the issues presented in both **Sultenfuss** and **Bankhead** differ from those presented in this case. With such strong language being used by the Eleventh Circuit with respect to Georgia's parole system, however, even if the particular situations of this case might result in a different constitutional outcome there is no way such a right has been "clearly established" by either the Supreme Court or Eleventh Circuit, so defendant TATUM would be entitled to qualified immunity.

Medical treatment violates the Eighth Amendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. To show an objectively serious deprivation of medical care, an inmate must demonstrate (1) an objectively serious medical need that, left unattended, poses a substantial risk of serious harm, and (2) that the response made by public officials to that need was poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law. In addition, to show the required subjective intent to punish, a plaintiff must demonstrate that the public official acted with an attitude of deliberate indifference, by demonstrating (1) awareness of facts from which the inference could be drawn that a substantial risk of serious harm existed, and (2) the drawing of this inference. **Salas v. Tillman**, 162 Fed.Appx. 918, 921 (11th Cir. 2006) (internal citations and punctuation omitted).

The case at bar does not deal with the potential risk of serious harm so much as it deals with the pain and suffering which plaintiff WHITEHEAD experienced for two years while his physical malady was misdiagnosed by the prison medical staff.  It is clearly established that a delay in treating an inmate's pain can render defendants liable as if they had inflicted the pain themselves, thereby becoming an Eighth Amendment violation. **Brown v. Hughes**, 894 F.2d 1533, 1538 (11th Cir. 1990).

## FACTS

The facts of this case dealing with the actual treatment the plaintiff received, though very long and dealing with complicated medical issues, are for the most part not in dispute:[3]  Prior to entering the Georgia prison system, plaintiff WHITEHEAD  lost both of his eyes as a result of a gunshot.  He was transferred to Men's State Prison on October 9, 2001.  On numerous occasions during the plaintiff's incarceration, defendant doctors KALU and ODERINDE, both of whom are general practitioners with no special training in ophthalmology, referred him to specialists to deal with a discharge coming from his eye socket and a lingering pain that was apparently associated with the discharge.  The first of these referrals resulted in the plaintiff's being seen by an ophthalmologist on October 24, 2001. The examining physician diagnosed plaintiff WHITEHEAD with sinus pain and suggested that a conformer be fitted for the plaintiff's right eye;  at that point his right eye socket was empty because a conformer had been lost in his transfer between prisons.  Plaintiff received his conformer on April 19, 2002, but his eye pain continued.  The prison medical staff continued to treat the plaintiff's "sinus infection" with antibiotics throughout 2002.

---

[3]The plaintiff has not filed a response to the defendants' Statement of Material Facts, and this Recommendation will treat the defendant's statement of facts as undisputed unless objected to in the plaintiff's pleadings.

On September 4, 2002, defendant KALU, the plaintiff's treating physician at MSP, requested that the plaintiff be seen by an ophthalmologist a second time. That request was granted, and plaintiff WHITEHEAD was seen by a general ophthalmologist on October 7, 2002. This ophthalmologist opined that plaintiff's eye pain was the result of allergic conjunctivitis; he recommended a follow-up with an ocularist. That request was honored, and the plaintiff met with an ocularist on February 19, 2003, at which time he was fitted with new conformers.

In the meantime, the prison medical staff treated the plaintiff's symptoms as though they were the result of allergic conjunctivitis. His symptoms were not alleviated, however. On April 8, 2003, defendant KALU submitted a consult request for an urgent follow-up with an ocularist regarding the discharge coming from the plaintiff's eye socket. That request was honored, but prison management decided that an ophthalmologist would be more appropriate. On May 15, 2003, plaintiff WHITEHEAD was seen by a general ophthalmologist who diagnosed him with papillary conjunctivitis and recommended topical antibiotic treatment and a follow-up with an ocularist.

Plaintiff was given artificial eyes on June 6, 2003. On August 15, 2003, plaintiff's pain, discomfort, and discharge having still not healed, defendant ODERINDE submitted a consult request for the plaintiff to be examined by an ophthalmologist for a cyst under his left eye. On October 16, 2003, plaintiff WHITEHEAD was examined by an ophthalmologist who requested at CT scan and referred him to Dr. Dilip Thomas, an oculoplastic/orbital surgeon. On October 21, 2003, Dr. ODERINDE submitted a consult request for the CT scan which was approved and conducted on October 29, 2003. The CT scan revealed multiple ballistic fragments remaining in both orbits from the initial gunshot wounds. On December 18, 2003, Dr. ODERINDE submitted a routine follow-up request for Dr. Thomas to excise the fragments.

On January 29, 2004, Dr. Thomas saw the plaintiff about the fragments and diagnosed his recurrent discharge, infection, and pain as resulting from a nasolacrimal duct obstruction brought about by a nasoorbitoethmoid fracture. A nasolacrimal duct infection is a rare condition that neither defendant doctor in this case had ever seen.

**DISCUSSION**

It appears to the undersigned that the dispute between the parties is whether the treatment provided to plaintiff WHITEHEAD by two general practitioners over the course of two years, in reliance on diagnoses made by specialists, constitutes cruel and unusual punishment in violation of the inmate's Eighth Amendment right when that he continues to be subjected to pain and discomfort as the result of what was later determined to be incorrect diagnoses.  Failure to diagnose a medical problem is generally not tantamount to deliberate indifference, but it can be when practitioners fail to further diagnose a problem or properly treat pain associated with that problem over time. *McElligott v. Foley*, 182 F.3d 1248, 1256-57 (11th Cir. 1999) (citing ***Brown v. Hughes, supra*** and four other cases where failure to adequately treat pain constituted a claim of indifference).

The defendants hang their argument on the fact that as general practitioners they could not be expected to diagnose the rare condition from which the plaintiff suffered. They argue that they requested that the plaintiff be sent to specialists when they could not treat his symptoms, and that they reasonably relied on the diagnoses of those specialists.  On three occasions, specialists incorrectly diagnosed plaintiff WHITEHEAD's condition, and after each of those diagnoses, the defendants treated the plaintiff for the particular ailment diagnosed by the specialists.  The experts provided by the parties — Dr. Thomas and Mr. Herndon[4] for the defendants and Dr. Bernardino[5] for the plaintiff — have conflicting views on whether this treatment constitutes deliberate indifference.

The defendants point out that Dr. Bernardino does not know if either the general practitioner defendant doctors or the ophthalmological specialists had the authority within the Georgia prison medical system to direct plaintiff WHITEHEAD to a sub-specialist for a more accurate diagnosis of the plaintiff's condition.  The undersigned agrees that Dr. Bernardino does not qualify as an expert with regard to prison policy, but the defendants never refute the fact that they could have recommended the plaintiff be seen by a sub-specialist after it was obvious that the treatments they were administering had failed.

---

[4]Mr Herndon is the ocularist who fit the plaintiff for his conformers and is not a defendant in this case.

[5]Dr. Bernardino is an oculoplastic and orbital surgeon at the Emory Eye Center.

The defendants also argue that "Dr. Bernardino can cite no clinical study, medical journal article or treatise to support the standard of care for 'timely' diagnosis of nasolacrimal duct obstruction by a general practitioner or general ophthalmologist" (Def. Supp. Brief., Tab #61 at 7). However, the defendants themselves fail to cite any such evidence to the contrary, relying instead on the testimony of *their* expert, Dr. Thomas, to bolster their case. A disagreement between experts is a dispute of fact. If a jury believes Dr Bernardino's testimony more credible, it could find that the defendants provided grossly inadequate care, thereby causing plaintiff WHITEHEAD to needlessly suffer pain resulting from his infirmity, constituting an Eighth Amendment violation. *See McElligott* 182 F.3d at 1257.

The defendants point to *Johnson v. Quinones*, 145 F.3d 164 (1998), a case coming from the Fourth Circuit, in support of their contention that misdiagnosis of an eye disease cannot constitute deliberate indifference without a showing of a defendant's subjective knowledge of the disease's harm. The issue in *Johnson* is different, however, from the one now before the court. In *Johnson,* the plaintiff sued the medical staff at the prison where he had been housed for two years because he alleged that he lost his sight as a result of their misdiagnosis. Plaintiff WHITEHEAD seeks damages for two years of pain and suffering that he experienced as a result of the defendant's misdiagnosis, claiming that the defendants had actual knowledge of the pain he was suffering as a result of his condition. In *Johnson*, the defendants did not realize that their misdiagnosis might result in their patient's loss of vision (which is what the case centered around), but it is undisputed that the defendants in the case at bar were well aware of the pain and discomfort that resulted from plaintiff WHITEHEAD's condition which, admittedly, never improved during the period of time he was under their care. The defendants' reliance on *Johnson* is therefore misplaced.

- 8 -

Plaintiff's expert, Dr. Bernardino, opines that by withholding treatment, as opposed to continuing with ineffective treatment, the prison medical staff *may* have been able to diagnose the plaintiff's symptoms.  Meanwhile , the defendants point out that Dr. Bernardino also admitted that "[t]here's no way of knowing if a quicker diagnosis of nasolacrimal duct obstruction would have resulted" if treatment had been withheld.  Whether or not a quicker diagnosis was guaranteed is not at issue here.  What is at issue is whether administering treatments that were obviously not effective over the course of two years represents deliberate indifference to a plaintiff WHITEHEAD's serious medical needs.

Dr. Bernardino also contends that conformers are medically necessary at all times; the defendants have provided testimony from both Mr. Herndon and Dr. Thomas stating the opposite. Plaintiff WHITEHEAD concedes that he suffered no damage after going for eight months without having a conformers or prosthetic devices in his eye sockets, and the defendants urge the court to dismiss any testimony regarding the possible dangers of leaving an eye socket empty for an extended period of time.  However, Dr. Bernardino has also noted that "the failure of Mr. Whitehead's physicians to timely replace his conformers with other conformers or prostheses contributed to his injuries by increasing the length of time that he unnecessarily was compelled to suffer from his symptoms." Tab #55 at ¶11.  The defendants call such an assertion "mere speculation" and urge the court to disregard it. This issue is similar to Dr. Bernardino's assertion that the defendants should have temporarily withheld treatment: The question remains whether replacing  plaintiff WHITEHEAD's conformers could have given the defendants more information about what was really wrong with the plaintiff when his condition was obviously not improving.  This is an unresolved question of fact.

While it is arguable that neither the failure to withhold treatment nor the failure to prescribe prostheses alone would amount to deliberate indifference, when combined, it is possible that a jury could conclude that by only administering antibiotics and antihistamines rather than trying to find the underlying cause of the symptoms, the doctors were taking "easier but less efficacious treatment". ***Waldrop v. Evans*** 871 F.2d 1030, 1035 (11th Cir. 1989).  After hearing Dr. Bernardino's testimony, a jury could believe that by continuing the same treatments to which plaintiff WHITEHEAD was not responsive and by not replacing his conformers, the defendants continued a pattern of not even trying to diagnose what the plaintiff's ailment was.

After viewing all of the evidence in the record, the undersigned finds that "[a] jury could infer deliberate indifference from the fact that [the defendant doctors] knew the extent of [the plaintiff's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [the plaintiff's] condition." *McElligott* 182 F.3d at 1257 (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir.1994)).

Accordingly, IT IS RECOMMENDED that the defendants' MOTION FOR SUMMARY JUDGMENT (Tab #45) be **DENIED** with respect to defendants DR. KALU and DR. ODERINDE but GRANTED with respect to Warden MEADOWS.[6]  Pursuant to 28 U.S.C. §636(b)(1), the parties may **WITHIN TEN (10) DAYS** after being served with a copy thereof file written objections to the RECOMMENDATIONS herein made with the Clerk of court, directed to the district judge assigned to this case.

SO RECOMMENDED this 22nd day of AUGUST, 2006.



CLAUDE W. HICKS, JR.
UNITED STATES MAGISTRATE JUDGE

---

[6]Though WARDEN MEADOWS is listed as a defendant in plaintiff WHITEHEAD'S complaints and subsequent pleadings, plaintiff makes no specific allegations against him.